McIlvaine, J.
1. An action on an undertaking for an attachment conditioned “to pay the defendants (in attachment suit) the damages which they may sustain by reason of the attachment, if the order therefor be wrongfully obtained,” where the only injury complained of resulted from the wrongful seizure of property owned by the obligees as partners, may be prosecuted in the names of the obligees as partners.
2. Where an attachment undertaking is executed, under the provisions of the civil code, to two or more persons conditioned “ to pay to them the damages which they may sustain,” etc., and the order of attachment be wrongfully obtained as against some of the obligees only, a right of action on the undertaking accrues to those obligees as against whom the order was wrongfully obtained and who were injured thereby; and in an action thereon by the injured parties, it is not necessary that those obligees, as against whom the order of attachment was rightfully obtained, should be joined either as plaintiffs or defendants.
*384 In determining whether the right of action on such undertaking be several or joint only, not only the terms of the bond, but also the provisions of the statute which authorize its execution must be considered, for such provisions must be regarded as much a part of the bond as if they were embodied in its terms.
The undertaking is executed to any or all of the defendants in the action, at the option of the plaintiff, and not by the consent of the obligees. The order of attachment may "be levied upon the separate property of the defendants as-well as upon their joint property. It may be dismissed as to some and enforced against other defendants, and on the final trial of the action, judgment maybe given for some and against others. It seems to us, therefore, that as the injury, against which the undertaking was intended to indemnify, may be several as well as joint, that the right of action thereon must also be several as well as joint. And as the general rule of the code is, that “every action must "be prosecuted in the name of the real party in interest,” we are of opinion that in actions on such undertakings, those obligees, and only those, who have an interest in the damages sought to be recovered, must be joined as plaintiffs or made parties to the suit.
3. If the foregoing conclusion be correct, it follows'that in an action on such undertaking by those obligees who-Rave an interest in the damages sought to be recovered, it is not necessary to aver or prove that the attachment had been discharged as against other obligees who have no interest therein and who are not necessary parties to the action.
4. The execution by the defendant in attachment of a redelivery bond, as provided for in section 199 of the code, can not be regarded as an admission of record that the order of attachment was rightfully obtained.
The true doctrine was stated, by way of argument, in the opinion of Judge Scott, in Fortman v. Rottier, 8 Ohio St. 553, as follows:
*385 “ The interests of a party may imperatively require that his property shall be released from a wrongful attachment without delay. May he not, in such a case, promptly procure the discharge of the attachment by payment of the-claim on which it is founded, or by executing an undertaking-according to statute, and thus arrest the threatened ruin, without abandoning his right to redress for the injury already-done?- The proceedings in attachment would thus be terminated, but not adversely to the claim of the party who-sued out the process. Nor would such a terminaton conclusively show that the process was rightfully sued out.”
5. In an action on an undertaking for am attachment for the recovery of damages resulting from the wrongful seizure and detention of a stock of goods kept for sale by retail, the jury, in awarding compensation to the owners,, may allow for natural and necessary losses occasioned by an interruption in the owner’s business, or, in other-' words, “for the loss of business during the time the same-was suspended.”
6. Compensatory damages in such cases includes reasonable costs and expenses incurred in procuring the discharge-of the attachment, and the restoration of the attached property, but not the costs and expenses incurred in the-defense of the principal suit.
7. On the trial in the court below, the plaintiffs were permitted (under exceptions) to introduce the following-testimony, by a witness who had no knowledge of the goods-seized in attachment at Marysville, Ohio, but who was engaged in the sale of like goods at another place, to wit:.
Q. “ Supposing a stock of goods belonging to the plaintiff's at Marysville, Ohio, composed of hardware, tinware, of all kinds of cutlery, and agricultural tools, of the market-value of $6,000, is seized on attachment, inventoried, and appraised, using ordinary care in handling the goods, and said stock remains in the store, closed, in the hands of the-sheriff', in the mouth of August, 1865, but receiving no attention to preserve the goods from injury, for the period of *386 •five days, and are then returned to the owner, what, in .your opinion, would be their market value to the owners?”
To which the witness answered: “ That the market value would be diminished in his opinion from ten to twenty-three centum.”
Q. “ Supposing a stock of goods composed of hardware, cutlery, tinware of all sorts, and agricultural tools, of the market value of $6,000, owned by the plaiutiffs, at Marysville, Ohio, and used in carrying on the retail business, which retail business amounted to $125 per diem, what is the value per diem of the use of such a stock of goods for five days, to the retail merghant owning them during the forepart of August, 1865?”
To which the witness answered: “ That it would be worth from $75 to $100 per day, and that the damage, by reason of the interruption to their business, would be as .much more.”
Q. “ "What would be the effect of the mere interruption, for that length of time, of such a business, by the sheriff', on •the market value of the goods?”
The witness answered: “ That such an interruption might very seriously injure the business by the loss of jobs and the -derangement of the trade, which might amount to more than the amounts of all the sales they might have made •during the time of the interruption.”
On cross-examination the said witness further testified: That it would, to some extent, cause an actual and intrinsic damage to the stock of goods, and that, in addition to that, there would, by the mere act of the seizure and levy of attachment be a stigma or discredit east on them, which would diminish the market value thereof in the hands of the owners, to whom they were returned, and included for this from five to fifteen per centum on the stock. It arises from the fact that the community ivould expect to buy the goods lower, on account of the fact that they had been seized by the sheriff. That it depended to some extent on the length of time the sheriff held them, and the extent it was known in the community, and the amount of -competition which existed at the time in that business at *387 that place, and the extent of the interruption of the business.”
The said witness, on further cross-examination, testified: “ That he once had a stock of goods taken in that way, and he never could make as much out of them after they were returned as he could have done before. Also knew of a ¡stock of horses and buggies, kept as a livery-stable, which the owner wished to sell, and an attachment was taken upon them, and the owner could not sell them for as much .after as the owner had been offered for them and could have sold them for, before they were attached by the sheriff. The detention of the goods by the sheriff for one day, would depreciate the market value of the goods about as much as five days, if it was generally known. The depreciation from this cause arises from the fact that the owner has not the power to sell the goods as well after as before the interruption of the business. New goods brought into the establishment by the owner afterward, would be stigmatized in the same way; and say one-half of the stock were seized and levied on by the sheriff, it would affect those in the store-room not seized as much as those seized.”
That the testimony thus admitted, should have been excluded, under the general rule of evidence, which requires facts and excludes opinions, is not denied; but the defendants in error seek to justify its admission, under certain exceptions to the general rule, which allow opinions as to values, and also the opinions of experts who possess peculiar knowledge in matters of trade, etc.
We think, however, that, the admission of this testimony -can not be justified under either of the exceptions named. The testimony given can not be regarded as an opinion as to the market value of the goods discharged from the attachment. The criteria for determining market values did not enter into the opinion given. No reference was had to knowledge of the goods, or prices realized on sales, or prices demanded or offered in the market. The opinion was not based upon a knowledge of any fact, nor upon the assumption of any fact, which fairly and reasonably indicates the *388 amount of loss or damage resulting from the causes named,, unless it be the very limited experience of the witness in relation to matters of that sort. But experience in such matters is not within the exception in favor of the opinions of experts. There is no skill or peculiar knowledge to be acquired by persons engaged in that particular line of trade, or any other trade, whereby a better opinion may be given in relation to the effect of the causes referred to. Customers-would be quite as capable as tradesmen to form an opinion in relation thereto.
Indeed, the only end accomplished by the admission of such testimony, is the substitution of witnesses for juors, and theories for facts.
8. The court below charged the jury in relation to the above testimony as follows:
“For the purpose of establishing the fact of a depreciation in the market value of these goods, is it competent for' the plaintiffs to call witnesses and prove, if they can, that the fact of the issuing and levy of the attachment upon a stock of goods impresses upon such goods such a stigma, blemish, or reputation as to reduce, impair or depreciate-the market value of the goods?” . . .
“Now, it is, perhaps, a fact indisputable, that there may be matters which may go to affect or impair the marketable-value of a commodity, which would not impair its intrinsic-value; as illustrations: such as second-hand goods, secondhand furniture, an article purchased out of a shop and used a slight apparent blemish on a horse, not affecting his strength, speed, draft, or sight; the value of second-hand-clothing in, larceny. The idea may, in some cases, be fanciful and unreasonable.
“ If, then, the jury should find from the evidence that the-mere levy of an attachment on a stock of goods, kept for the purpose of sale by retail, does impair or depreciate the market value of the goods in the community where they were at the time, that the refutation of the goods themselves-is so far affected as to affect their marketable value pre *389 judicially, you may take that into consideration in deter-mining the amount of the plaintiffs’ damages.”
In this instruction, we think there is error. If it could be shown by any legitimate testimony (which certainly excludes the mere opinions bf witnesses), that the mere levy of an attachment upon a stock of goods kept for the purpose of sale by retail, so far affects the reputation of the-goods as to impair their marketable value, still we think the injury is too vague and uncertain and the damages too remote to constitute a ground for recovery in an action on the attachment undertaking.
There are other assignments for error in the petition, but .among them we find no substantial error.

Judgment reversed and cause remanded.